[No. B032657. Second Dist., Div. Six. Feb. 3, 1989.]

FPCI RE-HAB 01, Plaintiff and Appellant, v.
E & G INVESTMENTS, LTD., et al., Defendants and Respondents.

COUNSEL

Dennis L. Mangrum for Plaintiff and Appellant.

Cappello & Foley and Michael L. Thornburg for Defendants and Respondents.

OPINION

STONE (S. J.), P. J.—FPCI RE-HAB 01, a California limited partnership (hereinafter RE-HAB), appeals from a judgment following the trial court's grant of summary judgment favoring respondents, E & G Investments, Ltd., a California limited partnership; Stonebridge Management Corpora-

tion, a corporation; Dennis Emory, an individual; John Gough, an individual; and Dennis Waldman, an individual (hereinafter referred to collectively as E & G). RE-HAB filed a first amended complaint for money damages against E & G based upon breach of agency by trustee, self-dealing, conspiracy, fraud, unjust enrichment, and constructive trust arising out of a foreclosure sale. RE-HAB alleges that E & G conspired to conduct the sale in a manner calculated to "chill the bidding" and permit E & G to purchase the property at lower than market value and to cause RE-HAB to lose its security interest.

The trial court ruled that in order to bring a cause of action based upon alleged irregularities in a trustee's sale, RE-HAB should have tendered the amounts due and owing on the senior obligations. RE-HAB appeals that ruling. We find that there are no genuine issues of material fact because RE-HAB has been unable to establish provable damages caused by E & G's actions in conducting the sale.

## FACTS

September 18, 1980, E & G sold certain real property in Oxnard, California (the property), to Charles and Carolyn Schultz and took back a promissory note in the principal sum of $790,990.21. September 21, 1982, the Schultzes sold the property to Project 80's Development Corporation subject to an all-inclusive trust deed (AITD) in which E & G was the beneficiary but which also included encumbrances senior to E & G. Project 80's executed a note and trust deed in favor of FPCI, RE-HAB's general partner, which took and held legal title in its own name, but held equitable title for the beneficial interest of RE-HAB, who advanced $351,000 to Project 80's to buy the property. In October 1982, Project 80's defaulted on its obligation to RE-HAB. The AITD went into default also although the senior encumbrances were kept current.

December 6, 1982, E & G caused its corporation, Stonebridge, acting as trustee, to file a notice of default on the AITD. E & G attempted to negotiate a settlement with the trustor and lien holders, offering to reconvey its interest if its equity under the AITD—$226,047.85—was paid. Finally, the trustee sent notice of foreclosure upon the entire indebtedness under the AITD—$845,199.71—and that the sale was for cash. E & G, the only bidder, purchased the property at the sale for a credit bid of $845,484.80, consisting of the assumption, in lieu of payoff, of all underlying encumbrances.

## DISCUSSION

RE-HAB contends that had the trustee not advertised the total indebtedness under the AITD was required in cash to cure the default,

other purchasers would probably have bid at the foreclosure sale, and RE-HAB would have received, from a fair sale, at least the amount due it under its note and deed of trust. In support of this argument, it points out that E & G sold the property shortly after the foreclosure sale for $1,125,000 to Dennis Waldman who, although present, had not bid at the foreclosure sale.

RE-HAB also asserts that under the terms of E & G's AITD, E & G's credit bid should have been reduced in an amount equivalent to the then unpaid principal balance of the included notes. Since the notice of foreclosure specified that the amount required to purchase the property was $845,199.71 (plus accrued interest) in cash, E & G should have had to pay the amount over its unpaid principal balance in cash and the senior lienors should have been paid off. Consequently, RE-HAB asserts that E & G alleged the total indebtedness due only to prevent prospective purchasers from attending the sale who might have bid $226,047.85 and taken the property subject to the senior encumbrances.

In *Arnolds Management Corp.* v. *Eischen* (1984) 158 Cal.App.3d 575, 577 [205 Cal.Rptr. 15], we held that "before a junior lienor may set aside a nonjudicial foreclosure of real property under a deed of trust because of irregularities in the sale, the junior lienor must first tender the full amount owing on the senior obligation." In *Arnolds,* plaintiffs filed an action to set aside a foreclosure sale and for damages for wrongful foreclosure based upon an alleged defect in the notice concerning the date of sale which prevented their attendance or participation. They also demanded damages for fraud and negligence premised upon the trustee's misrepresentations of the actual date of sale.

We noted in *Arnolds* that generally "an action to set aside a trustee's sale for irregularities in sale notice or procedure should be accompanied by an offer to pay the full amount of the debt for which the property was security." (*Arnolds Management Corp.* v. *Eischen, supra,* 158 Cal.App.3d at p. 578; *Karlsen* v. *American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117 [92 Cal.Rptr. 851].) This rule, traditionally applied to trustors, is based upon the equitable maxim that a court of equity will not order a useless act performed. (*Arnolds, supra,* at pp. 578-579.) "A valid and viable tender of payment of the indebtedness owing is essential to an action to cancel a voidable sale under a deed of trust." (*Karlsen, supra* at p. 117.)

Implicit in the plaintiffs' case in *Arnold* was the supposition that, had the notice of foreclosure sale been correct, plaintiffs would have been able to attend and redeem the property from the senior lien and be subrogated to all benefits of the superior lien. (See Civ. Code, §§ 2904, 2876, 2924c, subd. (a)(1).) We held in that context that "a junior lienor must allege tender of

the senior obligation as an essential element of any causes of action based upon irregularities in the sale procedure. To hold otherwise would permit plaintiffs to state a cause of action without the necessary element of damage to themselves." (*Arnolds Management Corp.* v. *Eischen, supra,* 158 Cal.App.3d at p. 580.) The rationale behind the rule is that if plaintiffs could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to the plaintiffs.

RE-HAB contends that *Arnolds* is not in point because an AITD presents a different problem in foreclosure than a usual deed of trust. Here, as distinguished from *Arnolds,* plaintiff was not attempting to set aside the foreclosure sale. Additionally, RE-HAB asserts that *Arnolds* should not be read so broadly as to preclude an action for fraud or other misconduct where the junior lienor is not attempting to set aside the sale and has, therefore, not tendered the amount of the senior indebtedness. Otherwise, it argues, a trustor's fraudulent conduct to "chill the bidding" or other misconduct resulting in the "washing out" of junior liens would be completely insulated from suit.

We agree that *Arnolds* was directed to actions precluding the opportunity of redemption or cure by a junior lien holder. ▮ In that instance, as in the case of a trustor in default, an essential prerequisite to challenging the foreclosure sale is the ability to tender the amount of the indebtedness or cure the default. Otherwise, plaintiffs could allege no damage caused by the irregularities. ▮ Here, RE-HAB contends its damage was caused by dissuading others from bidding an amount at the foreclosure sale that could pay off the indebtedness caused by the default at a "fair market value" which, in turn, would also pay off its own junior lien. By alleging the total indebtedness due under the AITD (over $800,000) instead of only E & G's "wrap-around" portion ($226,000), the only lien in default, fewer prospective purchasers were likely to be interested in attending the sale because of the considerable difference in cash required to purchase the property out of foreclosure.

In *Armsey* v. *Channel Associates, Inc.* (1986) 184 Cal.App.3d 833, 838 [229 Cal.Rptr. 509], we noted that the proper method of foreclosing on an AITD is unclear. " 'One of the most difficult problems involved with the overriding deed of trust is the manner of declaring a default and conducting a foreclosure sale in the event of the trustor's default. . . . [¶] . . . When the trustor defaults in his payments due under the overriding deed of trust, since these payments also include the sums due under the senior included obligation, does he [the beneficiary] declare a default in failing to pay the installments due on *both* obligations, or only the installments due on the overriding deed of trust? Upon the foreclosure sale, does the beneficiary bid

only the amount of his [] equity or does he bid the full amount . . . remaining on the overriding debt? . . . [¶] These questions should be answered by the terms of the overriding note and deed of trust. Since the beneficiary of the overriding deed of trust is obligated to pay the senior included debt, it should be provided expressly that a failure to pay the overriding note by its terms is a default under the overriding note and deed of trust only. The documents should also provide that the purchaser at the foreclosure sale is only purchasing the beneficiary's equity, and that the amount of the defaulted debt, and therefore the beneficiary's bid at the sale, is only the amount of his equity, after deduction of the amount due on the senior included debt; therefore, the purchaser at the sale receives his title subject to the senior included lien.' (1 Miller & Starr [Current Law of Cal. Real Estate (1975)] § 3:22, pp. 352-353.)"

E & G's AITD provided that the total indebtedness was all due and payable in the event of default. Consequently, the notice of amount due at the foreclosure sale was correct. Although the AITD also provided that the beneficiary must deduct from its credit bid the amount of principal owing on the senior encumbrances, we fail to ascertain how the discrepancy between the terms of the AITD and the manner in which the sale was conducted aids RE-HAB's cause. Its theory of damages is based upon speculation.

■ The statutory scheme concerning nonjudicial foreclosure contemplates that in order to protect its interest, a junior lienor must pay the trustor's obligation to the senior lienor. (*Arnolds Management Corp.* v. *Eischen, supra,* 158 Cal.App.3d at p. 579; Civ. Code, §§ 2904, 2876, 2924c, subd. (a)(1).) If a junior lienor does not cure the default in the senior obligation or redeem at the senior foreclosure, its lien will be extinguished at the foreclosure sale unless the successful bidder purchases at a price high enough to pay off the senior indebtedness and the junior indebtedness as well. (See, e.g., *Bank of Hemet* v. *United States* (9th Cir. 1981) 643 F.2d 661.) **(1c)** In order to prove it was damaged by the irregularities in the foreclosure sale which dissuaded or prevented a higher bid, the junior lienor would have to produce a ready, willing and able buyer who would have paid the higher price but for the wrongful conduct. Otherwise, damages alleged would be speculative.

Here, RE-HAB produced no such proof at summary judgment. It alleges only that the subsequent sale to Waldman for $1,125,000 was the fair market value and sufficient to have paid off E & G's equity owing under its "wrap around" note as well as RE-HAB's junior note. (RE-HAB is insolvent and has never offered to pay off E & G's note.) However, Waldman's deposition testimony, introduced at the hearing on summary judgment,

reveals that he paid only $90,000 in cash to E & G to purchase the property. E & G took back a fourth deed of trust and Waldman took the project subject to the AITD.

Consequently, RE-HAB presents no evidence that even Waldman, who attended the foreclosure sale, could have paid a cash price large enough to pay off E & G's note of $226,047.85, let alone an additional amount which would have inured to RE-HAB's benefit. RE-HAB failed to provide any evidence that any irregularities in the sale caused it damage, either through its own tender of the amount of indebtedness or that someone else was ready, willing and able to purchase the property for cash sufficient to both pay off E & G's equity in its own note and provide a surplus as well. Consequently, RE-HAB has failed, as a matter of law, to establish provable damages caused by E & G's alleged misconduct; the trial court did not err in granting summary judgment in favor of E & G.

The judgment is affirmed.

Gilbert, J., and Abbe, J., concurred.